The document below is hereby signed.

Signed: November 29, 2017



_S. Martin Teel, Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| SHARRA NEVES CARVALHO, | ) | Case No. 15-00646 |
| | ) | (Chapter 7) |
| Debtor. | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter. |

### MEMORANDUM DECISION RE SIMU'S MOTION TO REMOVE
### ESTATE TRUSTEE AND MOTION FOR LEAVE TO SUE TRUSTEE

Teodora Aureliana Simu has filed a *Unified Motion to Dismiss Bankruptcy Case for Bad Faith Motion to Remove Estate Trustee Motion for Leave to Sue the Estate Trustee* (Dkt. No. 131), incorporating an earlier *Motion to Remove Estate Trustee* (Dkt. No. 111) and an earlier *Motion for Leave to Sue Estate Trustee* (Dkt. No. 112).[1]  Simu seeks to remove the chapter 7 trustee, Bryan S. Ross, "for malfeasance and misfeasance in the non-administration of Debtor Sharra Carvalho's Estate" and seeks "leave to the Creditor to sue Trustee Bryan Ross for his breach

---

[1]  The court treated the *Unified Motion* as supplanting and thus withdrawing the *Motion to Remove Estate Trustee* (Dkt. No. 111) and the *Motion for Leave to Sue Estate Trustee* (Dkt. No. 112).  The court already entered an order (Dkt. No. 148) denying the motion to dismiss contained in the *Unified Motion.*

of fiduciary duties in his non-administration of the Debtor's
Estate." For the following reasons, Simu's motions will be
denied.

I

THE EVENTS LEADING TO ROSS'S REPORT OF
NO DISTRIBUTION AND THE EFFECT OF THAT REPORT

On December 15, 2015, the debtor, Sharra Neves Carvalho,
commenced this case by filing a voluntary petition under chapter
7 of the Bankruptcy Code (11 U.S.C.).  On her petition she noted
in response to item 17 that after any exempt property is excluded
and administrative expenses are paid no funds will be available
to distribute to unsecured creditors.  *See* Dkt. No. 1, at 6.

Pursuant to 28 U.S.C. § 586(a)(1), the United States Trustee
maintains and supervises a panel of private trustees that are
eligible and available to serve as trustees in cases under
chapter 7 of the Bankruptcy Code.  Ross has served as such a
chapter 7 panel trustee for 37 years.  On December 16, 2015,
pursuant to 11 U.S.C. § 701(a), the United States Trustee
appointed Ross to be the interim chapter 7 trustee in Carvalho's
case.

On December 16, 2015, the clerk issued a notice to creditors
regarding the commencement of the case, noting that Ross was the
chapter 7 trustee and that the meeting of creditors (under 11
U.S.C. § 341(a)), at which Carvalho was required by 11 U.S.C.
§ 343 to appear and testify under oath, was to be held on January

2

14, 2016.  In accordance with Fed. R. Bankr. P. 2002(e), the
notice indicated that no property appeared to be available to pay
creditors, and that if it later appeared that assets were
available to pay creditors, the clerk would send creditors
another notice telling them they can file proofs of claim and
stating the deadline for doing so.  *See* Dkt. No. 11.

On Carvalho's Schedule E/F, Carvalho listed Teodora Simu as
an unsecured creditor with a claim in the amount of $90,250.  *See*
Dkt. No. 1, at 22.  Prior to the commencement of the bankruptcy
case, both Carvalho and Simu at one point had been together
involved in the operation of  Elite Insurance & Consulting
Services, LLC ("Elite").  Simu had later sued Carvalho in the
Superior Court of the District of Columbia, asserting claims
relating to Carvalho's operation of Elite, and ultimately
recovering a $90,250 monetary judgment against Carvalho.  That
monetary judgment accounts for the $90,250 unsecured claim owed
to Simu that Carvalho listed in her Schedule E/F.  Carvalho also
scheduled a disputed unsecured claim of $374,741.45 owed to Simu
for attorney's fees accrued in the Superior Court case by Simu's
attorney, Matthew LeFande.  *See* Dkt. No. 1, at 22.

As of the petition date, Carvalho owned a 100% equity
interest in Elite.  Upon Carvalho's filing of her petition, that
equity interest in Elite became property of the estate under 11
U.S.C. § 541(a)(1).  Prior to the meeting of creditors, Ross

3

examined Carvalho's schedules and statement of financial affairs, which were filed with the petition (Dkt. No. 1, at 8-43) and signed by Carvalho under penalty of perjury, as well as Simu's complaint in the adversary proceeding (Adv. Pro. Case No. 16-10001, Dkt. No. 1).  On her schedules, Carvalho valued her interest in Elite as worth $1 and claimed an exemption of $1 with respect to that interest.  *See* Dkt. No. 1, at 11, 18.  Ross also examined Simu's complaint in the adversary proceeding, which included an allegation that Carvalho had falsely valued her interest in Elite as worth only $1.  *See* Adv. Pro. Case No. 16-10001, Dkt. No. 1, at ¶ 44.

Ross investigated the debtor's $1 valuation of Elite prior to the meeting of creditors.  He spoke to Merrill Cohen, Carvalho's attorney, regarding the nature of Elite's business, its assets, and its operation.  Cohen informed Ross that Carvalho operated Elite as an insurance brokerage firm out of her home; that Elite's clients were principally businesses managed by Spanish speakers; that Carvalho is bilingual in Spanish and English; and that Elite had no non-compete agreement with Carvalho that barred her from opening a new business and taking clients of Elite with her to the new business. Ross has known Cohen for 25 years.  As a chapter 7 trustee, Ross has been on the opposite side of Cohen in other cases and views him as highly credible.

4

Ross determined that because Carvalho is bilingual and Elite's clients are primarily Spanish-speaking, and because Carvalho operated Elite out of her home, it was likely prudent to have Carvalho continue to operate the insurance brokerage. Moreover, because Carvalho was not subject to a non-compete agreement, if anyone else began to operate Elite, Carvalho could immediately and lawfully form a new insurance brokerage and move all of Elite's clients to her newly formed brokerage.  These considerations led Ross to believe that Carvalho's valuation of Elite at $1 was accurate: especially in light of the absence of a non-compete agreement, a business broker would be unable successfully to sell the debtor's interest in Elite (or the underlying business of Elite) for a meaningful amount.

Ross had no reason to arrive at this conclusion as a favor to Cohen or to any other attorney at Cohen's firm.  Ross did not stand to benefit from granting Cohen or any other attorney such a favor.  Moreover, choosing not to sell Carvalho's interest in Elite if that interest actually could be successfully sold for a meaningful amount was actually against Ross's personal financial interest because, pursuant to 11 U.S.C. § 326(a), Ross was entitled to a commission from such a sale.

On January 5, 2016, almost one week before the meeting of creditors, Simu filed a complaint in this court commencing an adversary proceeding against Carvalho (Adv. Pro. No. 16-10001).

5

In that adversary proceeding, Simu sought under parts of 11
U.S.C. § 523(a) to declare the monetary judgment against Carvalho
nondischargeable and sought under parts of 11 U.S.C. § 727(a) to
deny Carvalho a discharge of any debts.[2]  Ross testified at the
hearing regarding Simu's motions to remove Ross as trustee and
for leave to sue Ross that he believes that he reviewed the
adversary proceeding complaint prior to the meeting of creditors.

Ross held the meeting of creditors on January 14, 2016, with
Carvalho, Cohen, and Simu's attorney, Matthew LeFande, in
attendance.  Under 11 U.S.C. § 702, when no one requested an
election of a trustee at the meeting of creditors, Ross's interim
status terminated and he became the trustee for the case.

Ross and LeFande examined Carvalho under oath for 20 to 30
minutes, with LeFande's questioning constituting a substantial
portion of the examination.  Carvalho's testimony supported the
information in her schedules, the representations in her
statement of financial affairs, and the information that Cohen
had provided to Ross before the meeting.  Pulling out some bank
records, Cohen noted that Elite had approximately $1,600 in its
bank account on the petition date, and that Elite's tangible
personal property consisted of a desk, some chairs, and a

---

[2]  The court dismissed that adversary proceeding on May 11,
2017, but Simu has pursued an appeal of the judgment of
dismissal.  The appeal is pending as Civil Action No. 17-01018-
RBW in the District Court.

computer.  Ross had no reason to disbelieve Cohen's
representations in that regard, and LeFande did not challenge
those representations by questioning Carvalho about their
accuracy or requesting further documentation.  Nor was any
testimony elicited that was inconsistent with Carvalho's
valuation of her interest in Elite at $1.

The meeting of creditors reinforced Ross's good faith view,
in the exercise of his business judgment, that the estate could
obtain nothing meaningful from the debtor's interest in Elite,
either by Ross attempting to sell the debtor's interest in Elite
or the underlying company itself or by Ross running the business.

As to the possibility of selling the debtor's ownership
interest in Elite or the underlying business, Ross concluded for
the aforementioned reasons that a business broker would be unable
to find a buyer willing to make a purchase at a meaningful price-
one that would leave money to be distributed to creditors after
payment of administrative expenses.  Because there was no non-
compete clause, after any sale of her interest in Elite, Carvalho
could easily open her own business and, on the basis of her
preexisting relationships and language skills, she could easily
take Elite's clients with her to the new business.

Additionally, Ross determined that an attempt to undertake
operation of Elite's business would not be beneficial to the
estate.  Elite is a separate entity from Carvalho; Carvalho did

7

not own Elite's assets and only owned an equity interest in
Elite.  To operate or sell Elite, Ross, holding the sole
shareholder interest as property of the estate, would have had to
exercise his shareholder rights and displace Carvalho as
management.  In order to comply with the proper procedures in
exercising those rights, Ross might have needed to seek legal
advice and the estate lacked necessary funds with which to employ
an attorney.

The crucial factor in Ross's decision not to take over
operation of Elite was that if Ross attempted to do so, he would
need to employ Carvalho to actually operate the business and to
deal with Elite's clientele, considering her preexisting
connections with her clients, her ability to speak with her
clients in Spanish, and the nonexistence of a non-compete
agreement.  Elite then would have to pay Carvalho compensation
for operating the company, likely leaving nothing for the estate.
Carvalho could insist on receiving the business's net revenues as
compensation and if Ross did not meet her demands she could just
leave Elite, open another insurance brokerage firm, and likely
take Elite's clients to the new firm.  If any revenue did remain
after payment of Carvalho's compensation for operating the
business, such remaining revenue would have likely been depleted
from other operating expenses (such as compensation of an

8

accountant to prepare tax returns) and the estate would retain no money for distribution to creditors.

Ross was aware that Carvalho was continuing to operate Elite, but he viewed Carvalho's continuation of receiving funds from Elite as reasonable compensation for work performed in operating the company and did not think it was worth the necessary time and expense to the estate to pursue recovery of such sums.  First, he thought he did not have a strong chance of success on the merits if he tried to pursue a recovery.  Second, pursuing such a recovery would result in several costs to the estate that would likely render the estate administratively insolvent.  The estate contained no funds with which to retain an accountant or expert to assist in pursuing such a cause of action, and with which to hire an attorney to represent the trustee in such an action.  The professional fees that would be incurred in pursuing such a cause of action, compared to the small likelihood of success in pursuing such a cause of action, led Ross to believe that pursuit of such an action would result in an administratively insolvent estate, producing nothing to distribute to creditors after payment of administrative expenses.

Ross's view in that regard has not been altered by Elite's tax filings for 2016, which treated the $64,647 that Elite distributed to Carvalho in 2016 as profit distributions, not as salary.  Carvalho was not required to operate Elite for free, and

9

Ross viewed the profit distributions in substance as compensation to Carvalho for her work as the sole manager of Elite.  He viewed $64,647 as fair and reasonable compensation, and as compensation the estate would have had to pay Carvalho had he decided to attempt to take over the operation of Elite and to employ Carvalho to do the actual work of running Elite's insurance business.  Under 11 U.S.C. § 541(a)(6), expressly excluded from property of the estate in a chapter 7 case are "earnings from services performed by an individual debtor after the commencement of a case."  *See Christie v. Royal (In re Christie)*, 233 B.R. 110, 112-13 (B.A.P. 10th Cir. 1999).

Through his observations at the meeting of creditors and his examination of the adversary proceeding complaint, Ross became aware of Simu's and LeFande's highly litigious nature regarding Carvalho, and the palpable vitriol that Simu and LeFande held towards Carvalho.  His observation of this tension and litigiousness resulted in two conclusions.  First, if Simu, who held such resentment and ill will towards Carvalho, did not make an offer to purchase Elite, then his judgment that Carvalho's interest in Elite had no value was correct.  Ross's view that the estate could gain nothing from the debtor's interest in Elite was strengthened by the failure of Simu, or LeFande on Simu's behalf, to make an offer to purchase that interest or the underlying business.  Simu, as Carvalho's opponent in the Superior Court

litigation and a creditor with knowledge regarding Elite's operations, was the obvious person to make such an offer if Elite had any value.  However, Simu never made an offer to purchase Carvalho's interest in Elite or the underlying business.

Second, even if Carvalho's interest in Elite had value and Ross were able to identify and secure a buyer, Simu and her attorney would be unlikely to consent to a reasonable sale price for Carvalho's interest in Elite or for Elite itself.  Ross feared that Simu, as a disgruntled creditor, might object to any sale effort as inadequate and subject the estate to litigation that would result in substantial administrative expenses that could result in an administrative insolvency, leaving the estate lacking sufficient funds to fully pay even administrative claims, let alone the claims of scheduled creditors.[3]

Even though the debtor's interest in Elite had no apparent value, Simu might have been motivated to purchase the interest to spite Carvalho and force her to undertake the annoyance of opening a new insurance brokerage firm.  If Ross did not dispose

---

[3]  Sadly, there are many chapter 7 bankruptcy cases in which a litigious debtor or creditor, questioning the trustee's business judgment in administering the estate, subjects the chapter 7 trustee to frivolous litigation that results in the estate becoming administratively insolvent or close to it.  One example is *In re Stephen Thomas Yelverton*, Case No. 09-00414, in which the debtor's repeated frivolous challenges to the trustee's settlement of a cause of action against Yelverton's siblings led to administrative claims swelling to a level at which they will exhaust or come close to exhausting the $110,000 in proceeds from the settlement.

of Carvalho's interest in Elite prior to the closing of the case,
and unless the court ordered otherwise, that interest would be
abandoned to Carvalho by operation of 11 U.S.C. § 554(c), which
provides that unless the court orders otherwise, "any property
scheduled under section 521(a)(1)of this title not otherwise
administered at the time of the closing of a case is abandoned to
the debtor and administered for purposes of section 350 of this
title." By purchasing Carvalho's interest in Elite, Simu could
have prevented Carvalho's interest in Elite from being abandoned
to Carvalho by operation of 11 U.S.C. § 554(c). Yet, again, Simu
never made any offer to Ross.

Simu's failure to make any offer to Ross, even of a nominal
amount, strengthened Ross's conclusion that Carvalho's interest
in Elite was of inconsequential value and benefit to the estate.
Ross concluded in good faith, in the exercise of his business
judgment, that he ought to terminate his administration of the
case because there were no assets he could liquidate in order to
make a distribution to creditors. Accordingly, on January 19,
2016, Ross entered a *Chapter 7 Trustee's Report of No
Distribution* as a docket text on the bankruptcy case's electronic
docket, reciting in pertinent part:

> Chapter 7 Trustee's Report of No Distribution: I, Bryan
> S. Ross, having been appointed trustee of the estate of
> the above-named debtor(s), report that I have neither
> received any property nor paid any money on account of
> this estate; that I have made a diligent inquiry into the
> financial affairs of the debtor(s) and the location of

12

> the property belonging to the estate; and that there is
> no property available for distribution from the estate
> over and above that exempted by law.  Pursuant to Fed R
> Bank P 5009, I hereby certify that the estate of the
> above-named debtor(s) has been fully administered.  I
> request that I be discharged from any further duties as
> trustee.

The associated electronic receipt reflects that, through the
court's electronic filing system, a notice, reciting the docket
text, was being e-mailed to LeFande.

The *Chapter 7 Trustee's Report of No Distribution* served as
notice that Ross was planning to abandon the debtor's scheduled
assets, via 11 U.S.C. § 554(c), by letting the case be closed
without the liquidation of any assets.[4]  In pertinent part, Fed.
R. Bankr. P. 5009(a) provides:

> if in a chapter 7 . . . case the trustee has filed a
> final report and final account and has certified that the
> estate has been fully administered, and if within 30 days
> no objection has been filed by the United States trustee
> or a party in interest, there shall be a presumption that
> the estate has been fully administered.

Here, the *Chapter 7 Trustee's Report of No Distribution* triggered
Rule 5009(a), and the estate was presumed to be fully
administered as of February 19, 2016, when no party filed an
objection to the *Report of No Distribution* by February 18, 2016
(30 days after filing of the *Report of No Distribution*).  Ross
viewed the filing of the *Report of No Distribution* as announcing

---

[4]  Such a report of no distribution is often referred to as
a "no asset report," meaning a report that there are no assets to
administer from which a distribution can be realized.

13

that the interest in Elite was being abandoned by the estate, and

Ross did not view it necessary to file a motion to abandon that

interest under 11 U.S.C. § 554(a).[5]  As explained in *In re*

*DeGroot*, 484 B.R. 311, 319 (B.A.P. 6th Cir. 2012):

> Section 554(c) [in contrast to a trustee's motion to
> abandon under § 554(a) or a party's motion to compel
> abandonment by the trustee under § 554(b)] provides for
> the second type of abandonment which is often referred to
> as "abandonment by operation of law" or "technical
> abandonment." *See LPP Mortg., Ltd. v. Brinley*, 547 F.3d
> 643, 648 n. 3 (6th Cir. 2008); *In re Reiman*, 431 B.R.
> 901, 908 (Bankr. E.D. Mich. 2010). Pursuant to this
> subsection, property which the debtor schedules and which
> the trustee has not administered is abandoned to the
> debtor at the closing of the case "[u]nless the court
> orders otherwise." *See Stark v. Moran (In re Moran)*, 566
> F.3d 676, 679 (6th Cir. 2009). Unlike abandonments under
> § 554(a) and (b) which require some "initiative" by the
> trustee or a party in interest, abandonment under
> § 554(c) "occur[s] automatically upon the closing of the
> bankruptcy case." *Olson v. Aegis Mortg. Corp. (In re
> Bloxsom)*, 389 B.R. 52, 59 (Bankr. W.D. Mich. 2008).
> Technical abandonment occurs without notice and a
> hearing. *DeVore v. Marshack (In re DeVore)*, 223 B.R.
> 193, 197 (9th Cir. BAP 1998).

Because he expected the *Report of No Distribution*, pursuant

to Rule 5009(a) and 11 U.S.C. § 554(c), to lead to a closing of

the case and abandonment of all scheduled estate assets, Ross saw

no need to file a motion under 11 U.S.C. § 554(a) to abandon the

interest in Elite ahead of the closing of the case.  In 37 years

as a trustee, Ross has never filed a motion to abandon assets

---

[5]  Under § 554(a), "[a]fter notice and a hearing, the
trustee may abandon any property of the estate that is burdensome
to the estate or that is of inconsequential value and benefit to
the estate."

when he has filed a report of no distribution.  Ross's work also
includes representing debtors in bankruptcy cases in which he is
not the trustee, and in that capacity, and otherwise, he has
never seen a trustee file a motion to abandon assets when the
trustee has filed a report of no distribution.

Under 11 U.S.C. § 704(a)(1), Ross was required to "collect
and reduce to money the property of the estate . . . and close
such estate as expeditiously as is compatible with the best
interests of parties in interest[.]"  Upon concluding that he
could not liquidate any assets of the estate to make a meaningful
distribution to creditors, Ross acted expeditiously to close the
estate by filing the *Chapter 7 Trustee's Report of No
Distribution* five days after the meeting of creditors.  Under 11
U.S.C. § 350(a), "[a]fter an estate is fully administered and the
court has discharged the trustee, the court shall close the
case."  Ordinarily, the presumption under Rule 5009(a) that once
a report of no distribution has been filed the estate had been
fully administered would have led to the clerk's closing the case
shortly after February 18, 2016.  In turn, under 11 U.S.C.
§ 554(c), the closing of the case would have effected the
abandonment to Carvalho of all scheduled assets of the estate,
including Carvalho's interest in Elite, unless the court ordered
otherwise.  The closing of the case would also have resulted in

15

the clerk paying Ross compensation of $60 for having handled the case.[6]

However, as of February 19, 2016, contested matters under Fed. R. Bankr. P. 9014 were pending in the bankruptcy case, such as Carvalho's motion (Dkt. No. 19) to hold Simu in contempt for violating the automatic stay of 11 U.S.C. § 362(a). The adversary proceeding brought by Simu against Carvalho was also still pending. For these reasons, even though Ross had taken the necessary step to close the estate by filing the *Chapter 7 Trustee's Report of No Distribution*, the clerk did not close the case. However, the pending contested matters and the adversary proceeding had nothing to do with Ross's administration of the estate. Accordingly, consistent with 11 U.S.C. § 350, the court could have issued an order (1) discharging Ross and closing the case shortly after February 18, 2016, and (2) directing that the case be simultaneously reopened for purposes of concluding the pending adversary proceeding and the pending contested matters. *See In re W.A.R. LLP*, No. 11-00044, 2011 WL 2693971 (Bankr. D.D.C. July 11, 2011) (closing a case as fully administered, upon

_____

[6] Under 11 U.S.C. § 330(b) and Item 9 of the *Bankruptcy Court Miscellaneous Fee Schedule*, a chapter 7 trustee is entitled to receive from the clerk (out of fees paid to the clerk by the debtor) a payment of $60 "after such trustee's services are rendered." After the filing of the report of no distribution, the estate was presumed to be fully administered, and the case should have been closed, with Ross receiving payment to him in the amount of $60 for having rendered his services as trustee.

overruling an objection to a report of no distribution, but
reopening the case to address a sanctions issue and the results
of any appeal), *aff'd*, 467 B.R. 543 (D.D.C. 2012); *In re Sindram*,
Case No. No. 08-00559, 2009 WL 361470 (Bankr. D.D.C. Feb. 6,
2009) ("The only reason that the clerk has not closed the case is
the happenstance that there is a pending contempt motion against
the debtor's condo association. That contempt motion ought not
stand as an obstacle to closing of the case for all other
purposes."). Unfortunately, the proper procedures were not in
place to alert the court to the need to close this case. The
consequence is that, for the 21 months that have elapsed since
February 19, 2016, Ross has been left in limbo, still serving in
the case as the trustee even though a presumption arose long ago
that he had fully administered the case, which entitled him to
have the case closed.

II

EVENTS IN THE LONG INTERLUDE
PRECEDING THE FILING OF THE INSTANT MOTIONS

Having filed the *Chapter 7 Trustee's Report of No
Distribution* on January 19, 2016, with no timely objections
having been filed thereto, Ross could properly take the view that
the estate was presumed to be fully administered as of February
19, 2016. A span of 14 months and 29 days transpired between the
filing of the *Chapter 7 Trustee's Report of No Distribution* on
January 19, 2016, and Simu's filing, on April 17, 2017, of the

17

instant motions to remove Ross as trustee and for leave to sue
Ross.  Nothing occurred in that long span that caused Ross to
change his view that there was no property available in
Carvalho's estate from which he could make a distribution to
creditors (after payment of administrative expenses).  LeFande,
on behalf of Simu, never contacted Ross during this long
interlude to discuss Ross's handling of the case, to urge him to
attempt to sell the debtor's interest in Elite as property of the
estate, to make an offer on behalf of Simu regarding Elite, or to
discuss any other aspect of the case.

During the long interlude, the adversary proceeding was
progressing.  On October 20, 2016, at the request of an attorney
for Carvalho in the pending adversary proceeding, Ross executed
an affidavit (Adv. Pro. No. 16-10001, Dkt. No. 65-4) to be used
by Carvalho in the adversary proceeding in pursuing a motion for
summary judgment.  The affidavit recited that Carvalho had
complied with 11 U.S.C. § 521 in providing documents to Ross, and
had complied with all requests of Ross for documents.

Ross spoke in November 2016 with Michael G. Wolfe, a Chapter
7 trustee in the District of Maryland, and became aware of the
unpublished *Memorandum of Decision and Order* issued by the late
Bankruptcy Judge Paul Mannes of the District of Maryland, in the
case of *In re Alan Schulman*, Case No. 13-19632 (Bankr. D. Md.)
(Dkt. No. 61 signed May 1, 2014, and entered May 2, 2014).  That

decision involved the sale by Wolfe, as trustee, of the estate's
interest in a small insurance agency of the debtor for a
relatively small sum.   Judge Mannes noted:

> The Debtor explained at the hearing that his business of
> selling health insurance is of a personal services nature
> and that he has had a relationship with many of his
> clients for 15 years or more.   The Trustee has no
> non-compete clause as to those client relationships; so,
> if the business were sold to a third party, the Debtor
> could solicit their business free of any constraints by
> the Trustee.

*Id.* at 1-2.   Judge Mannes also noted that "the court doubts that
they [two potential purchasers of the book of business currently
serviced by the debtor] had serious interest in purchasing a book
of business with nothing to tie it to the purchaser and with
Schulman free to solicit the accounts they were purchasing and
with Schulman free to solicit the accounts they were purchasing."
at 2.   This decision strengthened Ross in his belief that,
because of the absence of any non-compete clause respecting
Elite, he would be unable to sell Carvalho's interest in Elite,
as property of the estate, for a meaningful sum.

The *Memorandum of Decision and Order* also illustrates the
wisdom of Ross's fear that Simu, as a disgruntled creditor, might
subject the estate to administrative expenses if Ross attempted
to sell the interest in Elite and Ross were able to find a buyer.
The efforts of Wolfe, as the trustee in *In re Alan Schulman*, to
sell the estate's interest in the debtor's insurance business
resulted in an objection to the sale by the major creditor in the

19

case and subjected Wolfe to the expense of an evidentiary
hearing.  The major creditor declined to make any higher offer
for the interest being sold.  *Id.* at 1-3.  Attorney's fees in
excess of $5,000 were incurred by Wolfe in investigating and
pursuing the sale.  *In re Alan Schulman*, Case No. 13-19632
(Bankr. D. Md.) (Dkt. No. 72-1).  Those fees were allowed as an
administrative expense.

On April 4, 2017, at the request of an attorney for Carvalho
in the pending adversary proceeding, Ross executed an affidavit
that was filed in support of a further motion for summary
judgment filed on behalf of Carvalho.[7]  Thirteen days later, on
April 17, 2017, LeFande filed the instant motions on behalf of
Simu in the bankruptcy case, seeking to remove Ross and seeking
leave to sue him.

---

[7]   The affidavit (Adv. Pro. No. 16-10001, Dkt. No. 132-4)
was consistent with Ross's testimony in the hearing on the
instant motions.  In pertinent part, it recited that:

5. At the time of the meeting [of creditors], and
thereafter, I understood that Carvalho was continuing to
operate Elite, and I anticipated she would continue to be
compensated for operating Elite thereafter.

6. On January 19, 2016, I issued a report of no
distribution in the case.  I did not seek to operate
Elite and did not require the Debtor to close Elite or
liquidate its assets.  After issuing my report of no
distribution, I anticipated that the Debtor would
continue to own and operate Elite, and I did not object
to her receiving funds from the company.

20

III

THE MOTION TO REMOVE ROSS AS TRUSTEE

Under 11 U.S.C. § 324(a), a trustee may be removed "for

cause."  As is typical of the Bankruptcy Code, the "cause" which

would warrant the removal of a trustee is not explained or

detailed.  Any bankruptcy case involving removal of a trustee,

therefore, requires determination of the presence or existence of

"cause" on a case-by-case basis.  *In re Haugen Construction*

*Serv., Inc.*, 104 B.R. 233, 240 (Bankr. D.N.D. 1989).  A trustee

is granted wide authority and discretion regarding his chosen

methods of administering the assets of an estate, including his

decisions regarding whether assets are worth liquidating and

whether litigation is worth pursuing.  *See Mobile Diagnostech,*

*Inc. v. Cohen (In re Equimed, Inc.)*, 267 B.R. 530, 534 (D. Md.

2001).  As explained in *In re Consol. Indus. Corp.*, 330 B.R. 712,

715 (Bankr. N.D. Ind. 2005):

> A bankruptcy trustee is not required to prosecute every
> cause of action belonging to the bankruptcy estate.  *Koch*
> *Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d
> 1339, 1346-47 (7th Cir. 1987); *In re Reed*, 178 B.R. 817,
> 821 (Bankr. D. Ariz. 1995).  Instead, the trustee is
> given a substantial degree of discretion in deciding how
> best to administer the estate committed to his care and
> his actions are measured by a business judgment standard.
> *In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993);
> *In re Cult Awareness Network, Inc.*, 205 B.R. 575 (Bankr.
> N.D. Ill. 1997); *In re Curlew Valley Associates*, 14 B.R.
> 506, 513 (Bankr. D. Utah 1981); *Ford Motor Credit Co. v.*
> *Weaver*, 680 F.2d 451 (6th Cir. 1982).  So long as the
> trustee's decision concerning how or whether to
> administer an asset or to pursue a cause of action falls
> within the proper scope of the trustee's business

judgment, the trustee's decision will be upheld. *In re Cult Awareness*, 205 B.R. 575; *In re Fulton*, 162 B.R. at 540; *In re Wilson*, 94 B.R. 886, 888 (Bankr. E.D. Va. 1989).

Accordingly, "cause to remove a trustee cannot be found in actions that fall within the proper scope of the trustee's discretion and which do not represent some type of misconduct." *Id.* It follows that a trustee will not be removed for a mistake in judgment where that judgment was discretionary and reasonable under the circumstances. *See In re Equimed, Inc.*, 267 B.R. at 534; *In re Lundborg*, 110 B.R. 106, 108 (Bankr. D. Conn. 1990); *In re Haugen Construction*, 104 B.R. at 240. This case is similar to *Frostbaum v. Ochs (In re Samuel)*, 277 B.R. 470, 475-76 (E.D.N.Y. 2002), in which the District Court observed:

> The Trustee's decision that further attempts to collect assets from the Debtor would be fruitless and only result in greater expense in administering the estate was well within the scope of decisions left to the Trustee's business judgment. So long as this decision was not made arbitrarily, or in bad faith, it was appropriate for the Bankruptcy Court to accept this decision for the benefit of the estate and to grant the Trustee's final application. *See In re Curlew Valley Assocs.*, 14 B.R. 506 (Bankr. D. Utah 1981) ("In short the court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."); *see also In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993) (citing *Curlew* with approval and holding it appropriate for Trustee to close the estate and to abandon any causes of action for which recovery was highly unlikely); *cf. In re Lyon & Reboli, Inc.*, 24 B.R. 152, 154-55 (Bankr. E.D.N.Y. 1982) (quoting rationale of *Curlew* but distinguishing case at issue).

Simu contends that Ross unjustifiably decided that there were no assets available for distribution to creditors, that it was prudent to abandon the debtor's interest in Elite, and that he would not pursue any action against Carvalho regarding the postpetition distributions she received from Elite.  Such a decision is incident to the administration of the estate and is subject to the standard set forth above for deciding whether to remove a trustee: no removal is warranted if Ross's exercise of business judgment was discretionary and reasonable under the circumstances.  *See* 3 *Collier on Bankruptcy* ¶ 324.02[3], at 324-6 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Simu has not carried her burden of proof on that issue; she has not demonstrated that Ross engaged in misconduct rather than in accordance with his reasoned, discretionary business judgment.

As to Ross's decision not to administer the debtor's interest in Elite, Ross's abandonment of that interest must be upheld.  As explained in *In re Cult Awareness Network, Inc.*, 205 B.R. 575, 579 (Bankr. N.D. Ill. 1997):

> In reviewing the Trustee's decision to abandon property of the estate, the court must only examine that decision to ensure it reflects a business judgment made in good faith.  *In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993); *In re Wilson*, 94 B.R. 886, 888 (Bankr. E.D. Va. 1989).  Such a decision must rest on a reasonable basis. *Fulton*, 162 B.R. at 540; *Wilson*, 94 B.R. at 888-89.  The Trustee, therefore, need only demonstrate that he has exercised sound business judgment in making the determination to abandon.

23

*See also* 3 *Collier on Bankruptcy* ¶ 324.02[3], at 324-6 (Alan N.
Resnick & Henry J. Sommer eds., 16th ed.).  For reasons set forth
previously in this memorandum decision, Ross acted with diligence
and made a good faith and sound exercise of his business judgment
in exercising his discretion and determining that Carvalho's
interest in Elite was not worth administering.  As in *In re Cult
Awareness Network, Inc.*, 205 B.R. at 580, Ross's exercise of
business judgment was "not unreasonable or beyond the scope of
his discretion" and it will be upheld.

     For similar reasons, Ross ought not be removed based on his
decision not to sue Carvalho to recover distributions she
received from Elite, as that decision also, for reasons set for
previously in this memorandum decision, was a good faith exercise
of his business judgment that was discretionary and reasonable
under the circumstances.  A trustee is not required to prosecute
every cause of action belonging to the estate, and properly may
decide not to pursue a cause of action based on an exercise of
his or her business judgment that is discretionary and reasonable
under the circumstances.  *See In re Consolidated Indus. Corp.*,
330 B.R. at 715; 3 *Collier on Bankruptcy* ¶ 324.02[3], at 324-6
n.14 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)
(collecting decisions that support the conclusion that a trustee
is not required to prosecute every cause of action belonging to

24

the estate).  For all of these reasons, the motion to remove Ross
as trustee will be denied.

IV

THE MOTION FOR LEAVE TO SUE ROSS

Simu seeks leave to sue Ross.  She argues:

> "It is well established that a bankruptcy trustee may
> not be sued without leave of the appointing court for
> actions taken in the scope of his or her authority."
> *Lisowski v. Davis*, 312 B.R. 681, 686 (Bankr. D. Nev.
> 2004) (citing *In re Bay Area Material Handling, Inc.*,
> 1995 U.S. Dist. LEXIS 21598, 1995 WL 747954, *3 (N.D.
> Cal.), *aff'd* 111 F.3d 137 (9th Cir. 1997); *In re
> DeLorean*, 991 F.2d 1236, 1240 (6th Cir. 1993); *Leonard
> v. Vrooman*, 383 F.2d 556, 560 (9th Cir. 1967)).
> "Before leave to sue a trustee may be obtained, the
> claimant must be able to plead the elements of a *prima
> facie* case against the trustee."  *Lassman v. Reilly*,
> 393 B.R. 43, 50 (Bankr. D. Mass. 2008) (citing *In re
> Berry Publishing Services, Inc.*, 231 B.R. 676 (Bankr.
> N.D. Ill. 1999) (citing *In re Kashani*, 190 B.R. 875
> (9th Cir. BAP 1995))).  "A trustee 'cannot be held
> personally liable unless he acted outside the scope of
> his authority as trustee, *i.e. ultra vires*, or breached
> a fiduciary duty that he owed as the trustee to some
> claimant.'"  *Lassman v. Reilly*, 393 B.R. at 50 (quoting
> *State of Illinois, Dept. of Revenue v. Schechter*, 195
> B.R. 380, 384 (N.D. Ill. 1996)). "[F]ederal courts have
> uniformly held that bankruptcy trustees are subject to
> personal liability for the willful and deliberate
> violation of their fiduciary duties." *Connecticut
> General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d
> 612, 621 (1st Cir. 1988) (citing *In re Gorski*, 766 F.2d
> 723, 727 (2d Cir. 1985); *In re Cochise College Park,
> Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983); *Ford Motor
> Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.
> 1982); *Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.
> 1977)).

Dkt. No. 112, at 4.  Simu has not made out a prima facie case for
suing Ross based on Simu's foregoing recitation of the law.  Ross
at all times acted within the scope of his authority as trustee,

25

and breached no fiduciary duty owed as trustee to Simu and to the
other creditors of the estate.

V

CLOSING OF CASE

Simu has filed a motion (Dkt. No. 151) to convert the case
to chapter 11 (a motion that has not yet been fully briefed),
seeking to have the estate administered in chapter 11.  However,
a trustee, Ross, has already determined in the good faith,
reasoned exercise of his discretionary business judgment that the
estate should be closed, and that any assets of the estate,
including any cause of action against Simu, should be abandoned
via the closing of the case.  A presumption has arisen under Rule
5009 that the case has been fully administered.  In seeking to
remove Ross as trustee, Simu has failed to show that the court
should overturn Ross's determination that abandonment is
warranted and has failed to rebut the presumption that the estate
has been fully administered.  On the record relating to the
instant motions, it is time to bring the case to a close (except
for matters having nothing to do with the administration of the
estate): the case should be closed pursuant to the command of 11
U.S.C. § 350(a), and the case should then immediately be reopened
pursuant to 11 U.S.C. § 350(b) for the limited purpose of
addressing those other pending matters.

The motion to convert appears to argue that the issue of pursuing a cause of action regarding the postpetition distributions to Carvalho from Elite should be revisited in the chapter 11 case when Ross has already addressed that issue in chapter 7.   The motion to convert the case to chapter 11 may thus be an attempted maneuver around Simu's inability to obtain an order removing Ross as trustee.   Simu cannot successfully convert the debtor's case to a chapter 11 case for only this purpose.   In addition, the grounds for converting the case to chapter 11 that Simu raises in her motion to convert appear to rest on the erroneous assumption that the assets of Elite are property of Carvalho's bankruptcy estate.   For these reasons, Simu is unlikely to prevail in her motion to convert Carvalho's chapter 7 case to a chapter 11 case.   However, out of an abundance of caution I will limit the order pursuant to this decision to denial of the motions to remove Ross as trustee and for leave to sue him, and not close the case until the disposition of the motion to convert the case to chapter 11.

VI

CONCLUSION

In accordance with the foregoing, an order follows denying
Simu's *Unified Motion to Dismiss Bankruptcy Case for Bad Faith
Motion to Remove Estate Trustee Motion for Leave to Sue the
Estate Trustee* (Dkt. No. 131), which incorporated her earlier
*Motion to Remove Estate Trustee* (Dkt. No. 111) and *Motion for
Leave to Sue Estate Trustee* (Dkt. No. 112).[8]

[Signed and dated above.]

Copies to: Recipients of e-notification of filings.

---

[8] The court already denied the motion to dismiss for bad
faith contained in the *Unified Motion*. *See* Dkt. No. 148.  Simu
has appealed that denial and the appeal is pending as Civil
Action No. 17-2352-RBW in the District Court.